The next matter on our calendar is United States v. Calvin Weaver. Thank you. Good morning, and may it please the Court. My name is James Egan. I represent Calvin Weaver, the defendant appellant in this case. Mr. Weaver challenges only the district court's denial of his suppression motion. Try to speak a little bit louder or get the microphone up a bit more. Certainly. The only issue in this case is whether the officers had reasonable suspicion to believe that Mr. Weaver was armed and dangerous. Well, they thought he had something in his pants. Correct. They had no idea that it was a gun. That's right. And so what supported the Terry stop then? What supported the Terry stop? What supported their articulable suspicion of something dangerous? Well, I think what they say, and to be clear, nothing in the record from Officer Tom, who was the officer that was watching Mr. Weaver. He doesn't say that he thought it was something dangerous at all, just something. But they rely on the fact that it was in an asserted high-crime area, that when they first saw Mr. Weaver, he was looking at their car. Of course, they were in an unmarked Buick, tan Buick with tinted windows. They were driving at or below speed limit, looking at him, each of the three officers, at least two of them. We don't know what the third was doing. He looked back at them as this encounter occurred. Before Weaver got into his car, he was said to have adjusted his pants. We don't know what kind of pants he was wearing. All we know is the pants had a zipper. We also don't know if he had a belt. But in any case, he adjusted his pants by pulling them up. And they write that after patting him down, I mean, apart from everything else, they were sufficiently sure that there wasn't any weapon or anything that they said get your ID, that they allowed him to go into his pockets and get his IDs, which, you know, if they had any reason to think that there was a gun, they would certainly not, you know, that's not a get into your pocket where your ID is and where there may be a gun and you can shoot me. It seems a very bizarre thing to somebody to say if they had any reason to suspect anything. Right. I completely agree. And that is borne out by the fact that Officer Tom says that he didn't see a, to his credit, he says he didn't see a bulge. This happened when the appellate was sitting, still seated in the car. That's correct, Your Honor. So he approached and he, in Officer Tom's testimony, correct me if I'm misremembering, but he said, he asked him to put his hands up. Correct. And then he asked him to carefully reach into his, he said his ID was. Hand, right front hand pocket. And he didn't see a bulge. So he thought it would be sufficiently safe. And so he reached in and slowly handed over his ID card. That's, that's correct. Your Honor. He still didn't see a bulge at that point. There's no bulge. No. And then that's when Your Honor, that after turning over the ID card is when Officer Tom directed Weaver to exit the vehicle. He did so compliantly and still no bulge was noticed. Nothing shook loose. There was no additional observation of his pants that would indicate any. That's the explanation. I mean, the district court heard the testimony and credited Officer Tom's testimony. And your client didn't testify. So we're really focusing just on what Officer Tom testified to. And the part that seems most problematic for your side of the case seems to me that Officer Tom said he saw this squirming and pushing down on his pants while he's sitting in the, seated in the car as if he was trying to conceal something or move something so it wouldn't be visible. So what is the, so what's the explanation? Why is that not a pretty strong indication tending toward reasonable suspicion? Well, so you're right. I mean, it's unusual behavior. He calls it abnormal. And we're not challenging that finding. Weaver obviously didn't testify. He submitted an affidavit. He didn't really touch on that issue. So we take it Officer Tom's word for what happened. I would say though it was perhaps abnormal, it also was fully likely, just as likely, I suppose, that he was just merely adjusting his pants and seated ready to engage with a police officer. Now, I know that those two inferences are completely possible, and so you have to credit the district court's finding that it was suggestive of hiding something. But again, it's the something. It's not indicative of a weapon, and therefore we don't, there's no reasonable suspicion gets you nowhere. It doesn't get you. So your argument is that there may have been a reason to believe that there was something, he was concealing something, but it could have been drugs, and there's not enough in this case to suggest that it was specifically a gun or something that could harm the officer, so as to justify it. Right. And I think to that, too, there was, in what he observed, nothing that would indicate a gun, whereas in other cases there would be a bulge or he was, other cases, the defendant might reach multiple times for that area, adjusted in a way the officer said was like they adjusted their own weapons or had seen defendants in prior cases adjust a weapon. Nothing like that in this case. Just utmost he was adjusting. That was suggestive of hiding something, but that something is not a weapon. So he said nothing to suggest that he had a suspicion that there was something dangerous. Correct. And danger is the touchstone. That's right. We're looking for here. Isn't that correct? That's right. That's right. I'll yield the balance of my time. Thank you. May it please the Court. Karina Schoenberger for the United States. Mr. Weaver here was not frisked based on a mere hunch, but a series of specific facts along with the officer's rational inferences that gave rise to a reasonable suspicion that he was armed and dangerous. How often do people stop people because they don't signal within 100 feet of a ---- A hundred yards. Yeah. I mean, I get very angry at people who don't signal before they turn because I usually get in the wrong lane because of that, but I'm just wondering. I mean, this seems like the most pretextual of things that the government, that the police do when they have decided that they want to do something for other reasons. And I'm just wondering, how often does it happen that you stop people because they haven't signaled within a hundred? They signal, but that they signaled a little bit too late. I can't answer how often it happens, but the Supreme Court's decision in Wren forecloses a challenge to the stop if, in fact, there was a traffic violation and there was here. The lawfulness of the stop is not disputed in this case, and ---- I agree with you. I agree with you that we cannot question that. My question is, when that happens, if it is dubious, how skeptical should we then be of the fervor behavior? That is, how skeptical should we be of the things that are now said about, I thought maybe there was something, when lots of the behavior, like letting him get his ID, suggests that they were not suspicious of anything, and that the context in which this occurs may be okay under the Supreme Court, but justifies skepticism? All of the factors here need to be viewed together in one big picture and not in isolation. And the Court should keep in mind that each of these facts need to be viewed in light of the fact that when the police officers pulled over the car, the first thing that happened is that a door opened into traffic, and the officers believed that someone inside that car was trying to flee. And at that point, their suspicions were raised before they even approached the car. What were their suspicions about something dangerous? The question was not specifically posed to Officer Tom at the suppression hearing, but in the affidavit that the government submitted, rather Officer Tom submitted for the government's case, he does say that he suspected it was a gun when he saw Mr. Weaver squirming in his seat, pushing something down into his pants. That's at page 60 of the appendix. But he suspected a gun, but they still let him bring his driver's license out. And that's a remarkable thing to do if you suspect there's a gun. He wasn't protecting himself if he suspected a gun. He asked Mr. Weaver to move very slowly and kept his eyes on him while he was doing it. I do need to clarify one of the facts here that I realized last night was based on my misreading of the record. On pages 10, 17, and 20 of the government's brief, I suggest that all three of the car happen after Mr. or Officer Tom starts the pat-down. That's not correct. The first time that Mr. Weaver does it is before Officer Tom. That's important because one of the bizarre arguments is that you can justify behavior after a frisk by what you can justify a frisk by behavior after a frisk, which in Terry stops, the Supreme Court has told us you can't do, and I was really rather troubled about the suggestion that you could do it on a frisk. I mean, we've been quite clear that you can't justify the original thing by what you find after. It is important, Your Honor, and I think it's fair to say that once the frisk began, the suspicions were not immediately dispelled because of Mr. Weaver's movement. But it is important that he makes that movement once before the frisk starts. And I would just direct the Court's attention to pages 37, 61, and 66 of the record. Those were three pieces of the record that were before the district court. They consisted of Officer Tom's police report, his testimony in the county court, and also the affidavit that went in, again, in support of the government. I can't tell you what bothers me about a case like this. And frankly, what bothers me about a case like this is the exclusionary rule, which supposedly all liberals are all for and all conservatives are all against, and yet it seems to me that it leads to, in these very difficult decisions, any number of cases that say that something is okay. They found something. And they did find it. And that affects us because a person was guilty. But suppose they hadn't found a gun on these very facts, this search of a person's underwear. What does that do? I mean, is that something that, except for the fact that we have somebody here who is guilty and we will let them off if we don't say it's okay, aren't we okay in conduct, which, when the person is innocent, is really a disastrous thing to okay? And the problem is the exclusionary rule, but I can't do anything about that. The question before the Court is whether each of the facts that are articulated here give a reasonable reason. And I wonder how much on those facts I should ignore the fact that this person turns out to be guilty and ask whether on this set of facts this kind of search is something that we want to approve or we want to tell the police don't do it, because sometimes it's going to turn out that that isn't — doesn't turn up anything, but you've made somebody take off his pants. The Court should not be considering the fact that this person is guilty. That's not one of the factors that you should be looking at to determine whether there's reasonable suspicion. And on the question of whether there was suspicion that he was armed and dangerous, all of the furtive movements, all of the evasion trying to prevent the frisk are happening at the waistband. It's a common place to carry a gun, and the officer said, again, in the affidavit, not in his suppression hearing testimony, that he saw him pushing down into his pants and he thought he was hiding a gun. Well, he says this now, but it was equally likely that he thought he was hiding drugs. That's not what he said. He isn't — I'm not quite sure what you mean by now. I mean, in advance of the suppression hearing, what he was saying was that he thought that he was hiding a gun. After he finds the gun, he says he thought he was hiding a gun. But before that, he may have thought it was just drugs. That's true, Your Honor. The officer can only report what he thought after the conclusion of the frisk. In this case, he did find a gun. Does it really matter — does it really matter what he thought? We're asking objectively, would a — is there enough here to say that a reasonable person in these circumstances would have a reasonable suspicion that the person is armed and dangerous, as opposed to just trying to conceal something from the officer? It's an objective test. You can look to the officer's experience and their knowledge as an officer, but it is an objective test, Your Honor. This case was tried in the State court, or the suppression hearing occurred in the State court. That's correct. And the State court judge went the other way. I was having some difficulty with the district court opinion saying that a different standard was applied. I think it would be the same standard. DeBoer elaborates more than Federal law does, but reasonable suspicion standard is the same in both courts. I agree with you. I'm not completely confident that the county court judge applied the correct standard, but the county court judge's conclusion was there wasn't reasonable suspicion that there was — that the — to believe that the defendant had committed a crime, and therefore, they excluded the evidence. So it seems that the judge applied the wrong standard, whether or not that was the standard that should have been applied. There was also a bit of an evidentiary difference. It seemed that the county court was not — didn't have the benefit of some of the evidence that was presented to the Federal court. One thing, even though it was presented to the county court that Mr. Weaver had hitched up his waistband prior to the time they saw him get into the car, it seems that the county court judge didn't have the benefit of some of the evidence that was presented to the Federal court that he had hitched up his waistband prior to the time they saw him get into the car, and therefore, they excluded the evidence that Mr. Weaver had hitched up his waistband prior to the time they saw him get into the car. And so I think that the county court judge's conclusion was that the county court judge was moving when he was outside of the car, and — Now, we have said that the fact that something is a high-crime area is a relevant matter. This was proactive. And I'm just wondering, which way does the fact that it is proactive in a high-crime area cut, or does it cut it all? Does it make us more sympathetic because they were being proactive, or does the fact that they were being proactive make us more skeptical in a crime? That's — it's very unusual that you find a combination, and I haven't seen any discussion. What does — should we be more protective of the police judgment when they are being proactive in a high-crime area, or should we say, if you're being proactive, that's dangerous, and so we should require more than the general statement? I don't know. This was the Gang Violence Task Force. They were patrolling on the west side of Syracuse. It is described in rather vivid terms as a high-crime area. And they made the stop. It was a lawful stop. And as Justice Scalia said in Wren, writing for a unanimous court, it's an investigation tool that's available to police officers. Thank you. Thank you. Unless there are further questions. Thank you. Mr. Egan, you reserve two minutes for rebuttal. Thank you, Your Honor. A couple of things. The government is now claiming that all three, like, times that Weaver pressed against the car occurred — I'm sorry — that one of them occurred prior to the first. That's not true. Page 163, Weaver was directed to the rear of the car. Officer Tom makes clear that while he was standing close to the car, he was standing a few inches away from the car. He was directed to stand back. At that point, Tom began to press. Weaver moves forward. So that first time is not against the car. Second — It's based on Officer Tom's testimony. His testimony at the hearing, correct. I don't think there's discrepancy about — on that issue with his affidavit. However, there is, as the government pointed out, with his belief about a weapon. He says a weapon on page 60 of the record. He never says that at the hearing. I don't know. Unfortunately, at the time ahead, when there's, you know, inconsistency there, does the hearing control or does the affidavit control? I would think the hearing does, but if the Court wants — The government has conceded that ex post does not justify the frisk ahead of time. Now, in the suppression hearing, just as a technical matter, did they consider ex post, because the government before had argued that you could. I'm very glad to see the government argued to concede today that you can't do that. But I'm just wondering, in terms of what happened at the suppression hearing, did they consider some things that now we're told they could not have considered, even though there was some evidence before on the basis of which they could have found? But what happened there? Because if there was some evidence which would be enough before, but some evidence which they couldn't, how do I know what they went on? Well, I think Judge Sotobe, who wrote the decision, I think he made it clear that he relied on both, but also made it clear that he thought that everything that preceded what happened outside of the car was sufficient to establish reasonable suspicion. I think what the government is now saying that, as a general matter, you can't consider what happens after the frisk is initiated. But I think they're saying, factually, there was something that initiated the frisk of pushing up against the car, and I'm disputing that on page 163. Lastly, if I could just quickly, on the high crime area, I don't know about the question you're asking, but it is important, I think, to note that it's 5 o'clock, February 15th, Monday evening, still light outside. Weaver is moving from walking on the sidewalk or near the sidewalk to a car, getting in a car, and Hussein, they talked about the car in a high crime area is different than a stop that occurs outside of a car on foot in a high crime area. Not sure which way that tends. In this case, they don't know where Weaver is coming from. So is he just temporarily there? Is he getting off work? We don't really know. Anyway, that's all I have. Okay, thank you. Thank you. We'll reserve decision.